UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>v.<br><br>DAVID POPE<br><br>         Defendant. | Case No.:<br><br>Jury Trial Demanded |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against Defendant David Pope ("Pope" or "Defendant"), and alleges as follows:

**SUMMARY OF THE ACTION**

1. From at least 2014 through 2018, David Pope, a Lakeville, Minnesota resident, manipulated the quantities and values of rail freight contracts entered into by CHS Inc. ("CHS"), an Inver Grove Heights, Minnesota-based agricultural cooperative. As a result of Pope's misconduct, CHS's public financial statements for those time periods were materially false.

2. CHS is a global agricultural cooperative owned by farmers, ranchers, and cooperatives across the United States that provides grain, food, agronomy, and energy resources to businesses and consumers on a global scale. As part of its business, CHS enters into contracts with railroads, through direct auctions or through participation in the

secondary market, to transport commodities throughout North America. During the time period relevant here, CHS reported those contracts as derivative assets on its financial statements.

3. Pope served as CHS's senior, rail freight trader, in charge of the rail freight trading "desk" ("rail freight desk"). In that role, Pope was responsible for two key functions. First, he was the CHS representative at auctions to acquire rail freight contracts from railroads, and he also bought and sold such contracts for CHS in the secondary market. Second, he was the CHS employee responsible for properly reporting and valuing those contracts and providing that information to CHS's accounting personnel for incorporation into CHS's public financial statements.

4. Instead of properly valuing the contracts based on current market prices, Pope falsely manipulated the valuations. In addition, he also reported to CHS's accounting personnel contracts that didn't exist, causing them to be falsely included in CHS's books and records and in its public financial statements. Pope's fraudulent conduct caused the rail freight desk's profit and loss reports to appear much less volatile than Pope's actual performance.

5. As a result of Pope's fraud, CHS materially misstated its net income in the public reports that it filed with the SEC throughout the 2014 to 2018 time frame. Ultimately the company restated its net income for its fiscal years 2014 through 2018 to correct for Pope's fraudulent conduct. The adjustments required by Pope's misconduct were as high as approximately 43% of CHS's previously-reported net income figures.

6. By his misconduct, Pope violated the antifraud, books and records, and internal controls provisions, and aided and abetted violations by CHS of the books and records and reporting provisions, of the federal securities laws.

7. The SEC brings this action seeking permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, a civil penalty, and all other equitable and ancillary relief the Court deems just and proper.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9. Defendant, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and/or the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

10. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district. Defendant also resides within this district.

## DEFENDANT

11. **David Pope**, age 55 and a resident of Lakeville, Minnesota, was a CHS senior freight merchandiser—commonly referred to as a rail freight trader—until CHS terminated his employment shortly after discovering his conduct as alleged herein. During the Commission's investigation that preceded the filing of this Complaint, Pope asserted his Fifth Amendment privilege against self-incrimination and chose not to testify.

## FACTUAL ALLEGATIONS

### A. Pope was responsible for valuing certain assets reported on CHS's financial statements.

12. CHS is a cooperative whose equity is 70% owned by approximately 950 local cooperatives that are, in turn, owned by half a million farmers and ranchers. The balance of CHS's equity is owned by roughly 75,000 individual agricultural producers.

13. CHS operates in three reportable segments—Energy, Nitrogen Production, and Ag. The company's North American grain marketing operations fall within the Ag segment. As part of that business, CHS enters into rail freight contracts to secure transportation of commodities throughout North America.

14. In his position as senior rail freight trader, Pope ran the rail freight desk that was responsible for buying and selling rail freight capacity to support CHS's North American grain operations. Pope accomplished this task primarily by participating in auctions in which CHS bid for the right and obligation to use shuttle loader trains from

4

large railroads.  If CHS won the auction, the shuttle contract typically provided for the continuous operation, from one origin to one destination, of a 110-car train for one year.  Pope also sold, and occasionally bought, the right to use shuttles in the secondary market on behalf of CHS.

15. During the 2014 to 2018 time period, CHS accounted for its auction and secondary market shuttle transactions as derivatives.  Accordingly, the company carried the net value of the derivatives as an asset on its balance sheet and valued its shuttle capacity on a mark-to-market basis.

16. In his role as CHS's senior rail freight trader, Pope possessed significant responsibility.  Among other things, he was charged with accurately reporting CHS's shuttle contracts and their values to the company for derivative accounting purposes.

17. Pope did this by reporting (or causing others under his direction to report) to CHS accounting personnel the rail freight contracts entered into by CHS.  He also prepared bid sheets that, in theory, provided the current market values of CHS's shuttles.  He provided these bid sheets every month to CHS's grain marketing accounting group, which used them to calculate the rail freight desk's assets and its profit and loss statement for that month.  In turn, those calculations were included in CHS's public financial statements.

18. As Pope knew or was severely reckless in not knowing, CHS relied on him to provide accurate information because the shuttle contracts and valuations he reported were not substantively reviewed by other CHS employees.  In particular, as an

accounting control, CHS required Pope to sign the monthly bid sheets that he provided to the grain marketing accounting group to attest to the valuation of the company's shuttle contracts. In falsifying those bid sheets, Pope circumvented that control.

### B. Pope repeatedly and materially falsified shuttle valuations and quantities.

19. From at least 2014 through the summer of 2018, Pope manipulated the values of CHS's shuttle contracts by providing "marks" (i.e. valuations of the contracts) to the company's accountants that he knew, or was severely reckless in not knowing, did not properly value the company's freight contracts. Pope also frequently fabricated shuttle contracts that did not exist and reported or caused others to report those fabricated contracts into CHS's books and records that were included into the rail freight desk's financial results.

20. As noted above, as part of his duties, Pope submitted bid sheets that set out the values of the shuttle contracts he had purportedly obtained on CHS's behalf. Throughout the relevant time-period, these bid sheets contained materially false information.

21. Under well-known industry practice and accounting principles, and as Pope knew or was severely reckless or negligent in not knowing, his valuations should have been based on actual market data. But, when his supervisors and others generally familiar with valuing similar contracts confronted him after discovering his false entries, Pope was unable to produce any documents to support the valuations he provided.

Instead, he admitted that he ignored current market data and instead relied on what he claimed were his subjective predictions of future market prices, a process that resulted in improperly smoothing out the rail freight desk's, and ultimately CHS's, financial results. Specifically, altering the valuation data had the effect of evening out the rail freight desk's profits and losses by offsetting times in which Pope had overestimated or underestimated the amount of freight capacity that CHS should acquire and keep. Pope further admitted that he had reported non-existent shuttle contracts to, as he put it, "correct the record."

22.     Pope engaged in this misconduct on a monthly basis throughout the 2014 to 2018 timeframe.

23.     During August 2018, CHS's Vice President of North American Grain Marketing and a CHS corn trader reviewed one of Pope's bid sheets. Upon examining the document, both immediately recognized that the values provided by Pope were grossly incorrect. For example, Pope had provided early 2019 shuttle values as high as $4,000 per rail car. In reality, the market price for that time frame was less than $500 per car.

24.     Through his actions, Pope fabricated hundreds of fictitious rail car contracts, with marks up to $4,000 per car. Because of Pope's fraudulent conduct, those fictitious contracts and corresponding values were added to the company's books and

records and incorporated into its public financial statements and then included in reports filed with the SEC.

25. As part of his compensation package, Pope received bonuses that were tied to the performance of the Grain Marketing Division of CHS, which included the rail freight desk, and of CHS. Because of his actions described herein, Pope received financial bonuses that were higher than he would have received, but for his misconduct.

### C. Pope's conduct was intentional or at least severely reckless.

#### 1. Pope was an experienced trader who knew his valuation approach was wholly inappropriate.

26. Pope knew or was severely reckless in not knowing that the monthly bid sheets he submitted to CHS's accounting personnel for inclusion in the company's public financial statements were materially false. He also knew or was severely reckless in not knowing that these false numbers would impact the company's overall financial statements.

27. Pope was an experienced rail freight trader who understood the rail markets and the proper way to apply mark-to-market techniques to appropriately value the rail freight contracts as derivatives. And he knew that *proper* valuation must be based on actual current market data, such as recent actual trading values, and third-party sources, and not on his so-called subjective belief in what the contracts *might* be worth in the future. Moreover, Pope had ready access to, and received valuation information from, objective third-party sources that provided valuation information, including "broker"

8

sheets issued by a rail freight broker. Finally, Pope knew from his previous valuation practices that the fabricated numbers he began using in 2014 were wholly false.

28. In early September 2018, CHS management held a series of meetings to try to understand the reasons behind the grossly overstated valuations in Pope's bid sheets. During these meetings, Pope claimed that he based his reported values on his personal opinions about how shuttle prices would move in the future—while ignoring the current, substantially-lower market prices. Pope's misconduct resulted in Pope reporting materially false contract values.

29. Pope understood the impact that his actions had on CHS's financial statements. For example, he wrote in a September 6, 2018, email to his supervisors, certain accounting personnel, and the person who first flagged the grossly inaccurate valuations, that if he were to use shuttle market values, "People then need to be prepared for the large swings in P&L that can happen with the large swings in values…." In that same email, he referred to his alleged practice of assigning his own values as "valuing for railroad performance." As a result, Pope clearly understood that his misconduct was impacting the company's income calculations.

### 2. Pope's deception of CHS's auditor further shows Pope knew he had to hide his conduct because it was wrong.

30. Pope's deception of CHS's external auditor, a major international accounting firm ("External Auditor"), further demonstrates that he intentionally manipulated the shuttle values. In October 2017, an auditor working for the External

9

Auditor asked Pope what types of documentation CHS possessed to support the shuttles that CHS's records indicated it had won at auction. In response to the request, Pope forwarded two emails from a railroad with which CHS had entered into rail freight contracts. But before doing so, Pope doctored the emails. Specifically, he deleted and modified shuttle identifying information and terms, and also removed invoice hyperlinks and contact information for the individuals at the railroad that allegedly entered into the contracts with CHS. In short, he took steps to keep the External Auditor from contacting the railroad directly or from otherwise confirming the actual details of the contract.

31. A few days later, the same auditor emailed Pope, inquiring about the best way for the External Auditor to confirm with the railroad the existence of the shuttle contracts. Pope dodged the question, instead offering to email a document from the railroad website that provided an overview of the shuttle program. The External Auditor expressed his confusion and reminded Pope that he was simply trying to confirm that the railroad's record of contracts matched CHS's record. Ultimately, the External Auditor selected several shuttle contracts that it sought to confirm and received documentation for them from a CHS accounting employee. Among the documents received from the CHS accounting department was another email that Pope had manipulated. In turn, the External Auditor relied on Pope's fraudulent, doctored email to support the existence of fictitious shuttle contracts.

32. During the subsequent internal investigation conducted by CHS after Pope's conduct had been identified, Pope provided conflicting answers to questions, but

ultimately admitted manipulating shuttle values and adding nonexistent contracts to CHS's books and records.

### D. Pope's fraud materially impacted CHS's public financial statements.

33. Because of Pope's fraudulent conduct, CHS's Forms 10-K and 10-Q for fiscal years 2014 through 2017, and Forms 10-Q for fiscal year 2018, contained materially false financial statements. Specifically, Pope's conduct materially impacted the company's net income. For the same reason, the company's Forms 8-K filed with the Commission on June 14, 2017, December 8, 2017, and May 17, 2018, were also materially false. Further, these misstatements were incorporated by reference into CHS's 2014, 2016, and 2017 securities offerings on Forms S-1, S-3, and S-8.

34. On December 3, 2018, CHS filed a Form 10-K in which, largely to correct the false financial information resulting from Pope's misconduct, it restated its audited financial statements for fiscal years 2016 and 2017, as well as select financial information for fiscal years 2014 and 2015. The company also restated its unaudited financial statements for the first three quarters of fiscal years 2017 and 2018.

35. Although CHS also addressed additional issues in its restated financial statements, the restatement related largely to Pope's misconduct. Indeed, the impact of Pope's fraud to CHS's previously-reported net income during the relevant period ranged from 2.3% to 43.1%. In aggregate, Pope's actions inflated the company's net income by $123.9 million, accounting for 78.5% of CHS's total restatement.

36. The impact of Pope's misconduct broken down by time period is illustrated below:

| Time Period | Impact of Pope's Fraud on CHS's Net Income |
|---|---|
| 12 months ending 8/31/2014 | Net Income Understated by 7.3% |
| 12 months ending 8/31/2015 | Net Income Overstated by 16.9% |
| 12 months ending 8/31/2016 | Net Income Understated by 2.3% |
| 12 months ending 8/31/2017 | Net Income Overstated by 43.1% |
| 9 months ending 5/31/2018 | Net Income Overstated by 4.5% |

## FIRST CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(a) and (c)**

37. The SEC alleges and incorporates by reference each and every allegation in the paragraphs above as though fully set forth herein.

38. By engaging in the conduct described above, Defendant Pope, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, or of any facility of a national securities exchange, directly or indirectly employed devices, schemes, or artifices to

defraud, and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

39. Defendant Pope acted with *scienter* in that he knowingly or recklessly engaged in the fraudulent conduct described above.

40. By reason of the foregoing, Defendant Pope has violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rules 10b-5(a) and (c) [17 C.F.R. 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

41. The SEC alleges and incorporates by reference each and every allegation in the paragraphs above as though fully set forth herein.

42. By engaging in the conduct described above, Defendant Pope, directly or indirectly, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails has: (a) employed a device, scheme, or artifice to defraud; and/or (b) obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

43. With regard to the violations of Section 17(a)(1) of the Securities Act, Pope engaged in the conduct intentionally or with severe recklessness. With regard to the violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, he acted at least negligently.

44. By reason of the foregoing, the Pope has violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q].

## THIRD CLAIM FOR RELIEF

### Violations of Section 13(b)(5) of the Exchange Act

45. The SEC alleges and incorporates by reference each and every allegation in the paragraphs above as though fully set forth therein.

46. By engaging in the conduct described above, Pope knowingly circumvented a system of internal accounting controls and knowingly falsified CHS's books, records, and accounts.

47. By reason of the foregoing, Pope violated, and unless enjoined will continue to violate, Section 13(b) (5) of the Exchange Act [15 U.S.C. § 78m (b) (5)].

## FOURTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13b2-1

48. The SEC alleges and incorporates by reference each and every allegation in the paragraphs above as though fully set forth herein.

49. By engaging in the conduct described above, Pope directly or indirectly, falsified and caused to be falsified CHS's books, records, and accounts.

50. By reason of the foregoing, Pope violated, and unless enjoined will continue to violate, Exchange Act Rule 13b2-1 [17 C.F.R. 240.13b2-1].

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting CHS's Violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13

51. The SEC alleges and incorporates by reference each and every allegation in the paragraphs above as though fully set forth herein.

52. As described above, CHS's filings with the SEC, including its reports filed on Form 8-K, Form 10-Q, and Form 10-K, incorporated inaccurate and misleading financial information concerning CHS's business operations, revenue, and net and gross profit.

53. By engaging in the conduct described above, CHS violated Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13, which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file with the SEC periodic reports that are accurate and not misleading.

54. By engaging in the conduct described above, Pope knowingly or recklessly provided substantial assistance to CHS's filing of false and misleading reports with the SEC.

55. By reason of the foregoing, Pope aided and abetted, and unless

enjoined will continue to aid and abet, CHS's violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Pope is liable to the same extent as CHS for its violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13.

### SIXTH CLAIM FOR RELIEF

**Aiding and Abetting CHS's
Violations of Section 13(b)(2)(A) of the Exchange Act**

56. The SEC alleges and incorporates by reference each and every allegation in the paragraphs above as though fully set forth herein.

57. As described above, CHS failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of CHS.

58. By engaging in the conduct described, CHS violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

59. Pope knowingly or recklessly provided substantial assistance to CHS's failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of CHS.

60. By reason of the foregoing, Pope aided and abetted, and unless enjoined will continue to violate, CHS's violations of Section 13(b)(2)(A) of the Exchange Act, and pursuant to Section 20(e) of the Exchange Act

[15 U.S.C. § 78t(e)], Pope is liable to the same extent as CHS for its violations of Section 13(b)(2)(A) of the Exchange Act.

## RELIEF REQUESTED

Therefore, the SEC respectfully requests that this Court:

(a)  Permanently enjoin Pope from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)], and Exchange Act Rules 10b-5 [17 C.F.R. 240.10b-5],13b2-1 [17 C.F.R. 240.13b2-1]; and from aiding and abetting violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(a)], and Exchange Act Rules 12b-20 [17 C.F.R. 240.12b-20], 13a-1 [17 C.F.R. 240.13a-1], 13a-11[17 C.F.R. 240.13a-11], and 13a-13 [17 C.F.R. 240.13a-13].

(b)  Order Pope to disgorge ill-gotten gains and benefits obtained as a result of the violations alleged herein, plus prejudgment interest;

(c)  Order Pope to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

  (d) Grant such further relief as this Court may deem just and proper.

DATED: September 2, 2022    Respectfully submitted,

            s/David B. Reece
            DAVID B. REECE
            Texas Bar No. 24002810
            Securities and Exchange Commission
            Fort Worth Regional Office
            801 Cherry Street, 19th Floor
            Fort Worth, Texas 76102-6882
            Phone: (817) 978-6476
            Fax: (817) 978-4927
            reeced@sec.gov

            ATTORNEY FOR PLAINTIFF
            SECURITIES AND EXCHANGE
            COMMISSION

            ANDREW M. LUGER
            United States Attorney

            s/ Craig R. Baune
            BY:  CRAIG R. BAUNE
            Assistant U.S. Attorney
            Attorney ID No. 331727
            600 United States Courthouse
            300 South Fourth Street
            Minneapolis, MN 55415
            Phone:  612-664-5600
            Craig.baune@usdoj.gov

            *Local Counsel*